IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

BARBARA CRENSHAW,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )       No.   07-2010-M1V
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of the Social           )
Security Administration,             )
                                     )
          Defendant.                 )
_____

REPORT AND RECOMMENDATION
_____

     Before the court is plaintiff Barbara Crenshaw's January 10,
2007 appeal from a partial denial of her claim for disability
insurance benefits under Title II of the Social Security Act (the
"Act) by the Commissioner of Social Security ("Commissioner").
Crenshaw argues that the administrative law judge's ("ALJ") decision
that her period of disability did not begin until May 23, 2004 is
not supported by substantial evidence and that the ALJ did not apply
the proper legal criteria in reaching his decision.  The appeal was
referred to the United States Magistrate Judge for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For
the reasons that follow, it is recommended that the case be remanded
to the Commissioner.

1

## PROPOSED FINDINGS OF FACT

A.   <u>Procedural History</u>

On December 2, 2003, Crenshaw applied for disability benefits claiming that she was unable to work because of Meniere's disease, blurred vision, nausea, vertigo, high blood pressure, pleurisy, heart problems, arthritis, compressed disc in lower part of spine, carpal tunnel, torn Achilles tendon, and calcium deposits.  (R. at 45—47, 49.)  She alleged a disability onset date of October 6, 2000. (R. at 45.)   Her claim was denied initially and again upon reconsideration.   (R. at 32—39, 41—42.)   Crenshaw requested a hearing, which was held before ALJ Sheldon P. Zisook on December 6, 2005.  (R. at 14.)

On February 7, 2006, the ALJ issued a partially favorable decision in which he found that Crenshaw was disabled "beginning May 23, 2004, the month she was definitively diagnosed with Meneire's disease,"[1] but not for the prior claimed period of October 6, 2000 through May 22, 2004.  (R. at 18.)  Crenshaw appealed the ALJ's

---

[1]     Meneire's disease is an inner ear disorder, the cause of which is most likely a result of an abnormality in the fluids of one or both ears.  Symptoms include dizziness, hearing loss, tinnitus, and a feeling of fullness in the affected ear(s).   Symptoms may be sudden, unprovoked attacks of severe, disabling vertigo, nausea, and vomiting.   These symptoms usually last for 2 to 3 hours, but can rarely last up to 24 hours.  THE MERCK MANUAL OF MEDICAL INFORMATION (Mark H. Beers, M.D., et al. eds., 2d home ed. 2003), *available at* http://www.mercksource.com/pp/us/cns/cns_merckmanualhome.jsp.

2

decision to the Social Security Appeals Council ("Appeals Council"). (R. at 5—8.) On November 27, 2006, the Appeals Council denied Crenshaw's request for review of the ALJ's decision. (R. at 5—8.) Accordingly, the ALJ's decision became the Commissioner's final decision. On January 10, 2007, Crenshaw filed this action seeking judicial review of the ALJ's decision that her disability did not begin until May 23, 2004.

B.   <u>Medical History</u>

Crenshaw was born on October 18, 1942, and at the time of the hearing she was 63 years old. (R. at 45.) She has a high school education. (R. at 56.) She last worked in October of 2000 as a vice-president of a mortgage department. (R. at 49, 68.) Crenshaw was laid off from her position as a vice-president of mortgage banking on October 6, 2000. (R. at 49.) Crenshaw's duties in her job included extensive traveling and supervising approximately 111 people. (R. at 50.)

Crenshaw has an extensive medical history, which includes a motor vehicle injury to back and neck at age 35, hysterectomy at age 36, coronary bypass surgery at age 46, hypertension, hypothyroid, and community acquired pneumonia. (R. at 15, 109, 117). Moreover, she was most recently diagnosed with lung cancer. (R. at 509—11.) Crenshaw asserts that she became disabled in October 2000 due to

Meneire's disease and vertigo,[2] (Pl.'s Mem. 2; R. at 45), and that she began experiencing symptoms associated with Meneire's disease as early as April 1999, (Pl.'s Mem. 3; R. at 117), and intermittently through September 2000.  (Pl.'s Mem. 3; R. at 319—27.)

Since her initial complaint of vertigo-related symptoms, Crenshaw has generated at least twenty-five sets of medical records from various doctors and clinics in the Memphis area regarding various health issues.  (R. at 2—3.)  As Crenshaw notes in her memorandum, it is likely that because of her multiple medical problems that her doctors were challenged in finding the source of her complaints of vertigo.  (Pl.'s Mem. 3; R. at 117—19.)  For example, in addition to the above ailments and treatments, Crenshaw suffered from repeated infections and respiratory illnesses, chronic fatigue, burning pains in her shoulder blade, emotional and psychological stress, pleurisy, carpal tunnel syndrome, a growth in her liver, headaches, and occasional heart palpitations.  (R. at 117.)

In August 2001, Dr. Dean Klug, an ear, nose and throat

_____

[2]    "Vertigo is a false sensation that one's self or the surroundings are moving or spinning, usually accompanied by nausea and loss of balance. . . . Vertigo can be caused by disorders affecting the inner ear (including the semicircular canals), which enables the body to sense position and maintain balance. Vertigo may also be caused by disorders affecting the acoustic nerve (cranial nerve VIII), which connects the inner ear to the brain, or disorders affecting the connections in the brain stem and the cerebellum, which also help control balance." MERCK MANUAL, *supra* note 1.

specialist, performed audiometry, ECOG and ENG tests on Crenshaw, concluded that the tests were positive for Meneire's, and diagnosed her with Meneire's disease. (R. at 188, 361.) However, Dr. Klug did not render an opinion that Crenshaw was disabled at that time. (R. at 360–61.) Since Dr. Klug's August 2001 assessment, there are at least five instances in the record, from as early as October 4, 2002, of various medical professionals referring to Dr. Klug's Meneire's disease diagnosis. (R. at 183, 310–11.)

In June 2002, Dr. Klug referred Crenshaw to Dr. Bruce Fetterman, an otolaryngologist, because Dr. Klug believed his August 2001 diagnosis was "not strongly positive" for Meneire's disease. (R. at 359.) Crenshaw told Dr. Fetterman that she suffered severe vertigo. (R. at 157.) She also told Dr. Fetterman that she "want[ed] disability." (R. at 157.) Dr. Fetterman diagnosed Crenshaw with benign paroxysmal positional vertigo (BPPV)[3] and vestibular dysfunction, but not Meneire's disease. (R. at 157.) However, according to Crenshaw, she continued to experience debilitating bouts of vertigo and dizziness. (R. 165, 309, 358.)

On May 25, 2004, Crenshaw returned to Dr. Klug after approximately a three-year lapse in office visits. (R. at 358–59.)

---

[3]   BPPV is a common disorder in which dizziness is caused by a change in head position. A BBPV episode causing dizziness can start 5 to 10 seconds after head movement and lasts less than a minute. Episodes usually subside on their own in weeks. Occasionally, they persist for months and can cause dehydration due to nausea and vomiting. No hearing loss or noise in the ears (tinnitus) occurs. MERCK MANUAL, *supra* note 1.

Dr. Klug, in his office visit notes, affirmed that he had referred Crenshaw to Dr. Fetterman after he had "initially done a workup which suggested Meneire's disease but was not strongly positive." (R. at 359.)  Dr. Klug noted that Dr. Fetterman had diagnosed Crenshaw with positional vertigo that was "not severe," that Dr. Fetterman was a "fellowship trained otologist and balance expert," and that Dr. Fetterman did not believe there was a "major pathology occurring to cause Crenshaw's complaints of vertigo."  (R. at 359.) Dr. Klug stated that upon review of Dr. Fetterman's assessment it appeared that Crenshaw "[did] have findings consistent with benign positional vertigo, but [that] she [was] not satisfied with that diagnosis and . . . want[ed] another opinion."  (R. at 359.)  Dr. Klug noted that Crenshaw did not want to return to Dr. Fetterman "because apparently he did not give her the results that she so desired in pursuing her disability." (R. at 358.)  As a result, he referred Crenshaw to the Shea Clinic where they could perform further testing, because Dr. Klug did not have the specialized equipment needed to perform advanced testing.  (R. at 359.)  Dr. Klug then noted that "if [the Shea Clinic] find[s] the same results [as Dr. Fetterman] then there maybe some element of malingering or secondary gain related to these complaints, but at this point there appears no pathology that I can determine from our testing." (R. at 358.)

Dr. Shaw, an otolaryngologist and neuro-otologist at the Shea Hubbard clinic, reported his findings on August 20, 2004.  (R. at 382—83.)  Dr. Shaw stated that his impression was that Crenshaw had

6

"some type of vestibulopathy,[4] but . . . could not accurately determine whether it was more peripheral or more central in nature." (R. at 382.)   Dr. Shaw asked Crenshaw whether she appeared to be dizzier on turning to one side or the other while in bed because "some aspects of the symptomatology suggested at least a component of benign positional vertigo." (R. at 382.)  Crenshaw reported that it did seem worse on the right side.  (R. at 382—83.)  Dr. Shaw stated that through treatment "[Crenshaw] has made some progress in the condition and feels somewhat better." (R. at 383.)  Dr. Shaw concluded that he was hopeful that Crenshaw would eventually be able to return to her previous type of work.  (R. at 383.)

On July 19, 2005, Dr. Klug completed a medical assessment form in which he opined that Crenshaw's vertigo would cause her to require an unspecified amount of bed rest during the day, that she would need more than the one 30-minute break and two 15-minute daily breaks normally allowed, that she would not be reliable as to attending a 40-hour work week, and that her medical condition would cause lapses in concentration or memory on a regular basis.  (R. at 468—69.)   Dr. Klug further noted that Crenshaw would have a reasonable medical need to be absent from full time work on a chronic basis (four absences during any month's period).  (R. at 470.)

C.    The ALJ's Disability Determination

---

[4]    "A vestibulopathy is any abnormality of the vestibular apparatus, e.g., Ménière disease."  STEDMANS MEDICAL DICTIONARY (27th ed. 2000).

Using the five-step disability analysis,[5] the ALJ ruled that Crenshaw was entitled to a period of disability and disability insurance benefits beginning May 23, 2004, based on the objective findings that Crenshaw's impairments prevented her from performing any work activity after that point in time.  (R. at 18, 19.)  The ALJ based his opinion on the record as a whole and gave more weight to the opinion of the treating specialist, Dr. Klug, who stated that Crenshaw was ". . . capable of light work, . . . [but that] non-exertional limitations; i.e., turning her head, looking up, bed rest during a normal eight-hour workday, problems with endurance and excessive absenteeism . . . would essentially preclude all work activity and satisfied the definition of disability under the Social Security Act."  (R. at 18.)

Under the first step, the ALJ found that there was no evidence showing that Crenshaw had engaged in any "substantial gainful

[5]     Entitlement to Social Security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations.  20 C.F.R. §§ 404.1520, 416.920.  First, the claimant must not be engaged in substantial gainful activity for a period of not less than twelve months.  20 C.F.R. § 404.1520(c).  Second, a finding must be made that the claimant suffers from a severe impairment.  *Id.*  Third, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled.  If the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the residual functional capacity to return to any past relevant work.  20 C.F.R. § 404.1520(e).  If the ALJ finds the claimant unable to perform past relevant work, then, at the fifth step, the ALJ must discuss whether the claimant can perform other work, which exists in significant numbers in the national economy.  20 C.F.R. § 404.1520(f).

activity at any time since October 6, 2000." (R. at 15.) Under the
second step, the ALJ concluded that Crenshaw met the medically
determinable severe impairments of "Meneire's disease,
atherosclerotic heart disease (post remote coronary artery bypass
grafting), degenerative disc disease of the lumbar spine,
hypertension, and obesity, all of which had more than a minimal
effect on [her] ability to engage in work activity." (R. at 15.)
Under the third step, the ALJ concluded that none of the above
health problems met or medically equaled one of the listed
impairments in Appendix 1 of Subpart P to Regulation No. 4. (R. at
17, 20.)

Under the fourth step, the ALJ then had to determine whether
Crenshaw retained the residual functional capacity to perform past
relevant work or could adjust to other work. (R. at 17.) Under
Social Security Ruling 96-6p the ALJ considered the opinions of the
state agency medical consultants "regarding the nature and severity
of the claimant's impairments." (R. at 17.) Those consultants
found, without examination, that Crenshaw was capable of "lifting
50 pounds occasionally, 25 pounds frequently, and standing, walking
or sitting up to six hours in an eight-hour day at tasks that
required no more than occasional stooping and did not involve
exposure to hazards." (R. at 18.) The ALJ noted, however, that
they did not examine Crenshaw nor did they have the benefit or
reviewing subsequently received medical evidence that might have
changed their opinions. (R. at 18.) The ALJ concluded that during
the period of October 6, 2000 through May 22, 2004, Crenshaw

9

retained the residual functional capacity to lift up to 10 pounds occasionally, stand and walk up to two hours in an eight-hour day, and sit up to six hours in an eight-hour day. (R. at 18.) The ALJ noted that beginning May 23, 2004,

> the month [Crenshaw] was definitively diagnosed with Meneire's disease, but not prior thereto, Crenshaw became incapable of  lifting even ten pounds occasionally, standing and walking two hours in an eight-hour day, or sitting six hours in an eight-hour day at occupational tasks that did not require climbing, balancing, stooping, crouching, kneeling, crawling, above shoulder reaching, ore more than occasional slow head movement.

(R. at 18.)  Therefore, the ALJ found that Crenshaw was incapable of performing her past work as a mortgage banker, which, according to the Dictionary of Occupational Titles ("DOT") would require her to be able to "lift up to 10 pounds occasionally, stand and walk up to two hours in a eight-hour day, and sit up to six hours in an eight-hour day."  (R. at 19.)

At the fifth step, the ALJ found that given Crenshaw's residual functional capacity, advanced age, education, and past work experience, on May 23, 2004, but not before, there were no existing jobs in significant numbers in the national economy that Crenshaw was capable of performing. (R. at 19.)  Accordingly, the ALJ held that Crenshaw was disabled and entitled to disability benefits as of May 23, 2004.  (R. at 19.)  A review of Crenshaw's earnings record revealed that she had earned sufficient quarters of coverage to remain insured only through December 31, 2005, so in order to be eligible for benefits under Title II of the Act, disability would have to have been established on or before December 31, 2005.  (R. at 14.)

10

PROPOSED CONCLUSIONS OF LAW

Crenshaw takes issue with the ALJ's determination that she did not become disabled until "May 23, 2004, the month she was definitively diagnosed with Meneire's disease." (Pl.'s Mem. 5.) First, Crenshaw argues that "the date a medical condition is diagnosed or documented is not [necessarily] the day it began." (Pl.'s Mem. 5—6.) Second, she contends that contrary to the ALJ's finding, her impairment met the requirements of Listing 2.07 as early as August of 2001. (Pl.'s Mem. 6—8.) Finally, Crenshaw asserts that the ALJ failed to properly follow the instructions of Social Security Ruling 83-20 for determining the onset date of her disability, which requires the use of a medical expert. (Pl.'s Mem. 8—9.)

A.   Standard of Review

Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision, and whether the Commissioner used the proper legal criteria in making the decision.  42 U.S.C. § 405(g); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  Substantial evidence is more than a scintilla of evidence but less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record taken as a

whole and must take into account whatever in the record fairly detracts from its weight. *Abbott*, 905 F.2d at 923. If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." *Barker*, 40 F.3d at 794 (quoting *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

B.   The ALJ's Determination of Crenshaw's Onset Date of Disability

    1.   *Whether the determination was supported by substantial evidence.*

Crenshaw argues that the ALJ's choice of May 23, 2004, as Crenshaw's onset of disability was arbitrary "because neither the ALJ nor the Commissioner can point to any change in [Crenshaw's] condition that [made] Crenshaw disabled on that date, but not earlier." (Pl.'s Resp. Opp'n Def.'s Mem. 1.) In fact, May 23, 2004, was not even a date she visited a doctor or the date of any doctor's opinion. Crenshaw did see Dr. Klug on May 25, 2004, and on that date he referred her to Dr. Shea for further testing. (R. 358.) Crenshaw asserts that her May 25, 2004 consultation with Dr. Klug does not in any way signify that her disabling symptoms began on that date and not earlier. (Pl.'s Resp. 2—3.)

The Commissioner concedes that "May 23, 2004, was not actually

the date that [Crenshaw] was definitively diagnosed with Meneire's disease, [as stated by the ALJ] but the date Dr. Klug referred her to Dr. Shea for further testing of her condition." (Def.'s Mem. 5.) Nevertheless, the Commissioner argues that the ALJ's finding of May 23, 2004, as the disability onset date was not an arbitrary finding because the ALJ based his findings on the record as a whole and, in particular, on Dr. Klug's July 2005 medical assessment of Crenshaw. (Def.'s Mem. 5.)  The Commissioner points out that it was not until Dr. Klug's July 2005 assessment that any doctor rendered an opinion that Crenshaw had disabling limitations. (Def.'s Mem. 6.) Therefore, the Commissioner concluded that because none of Crenshaw's doctors had found her disabled before Klug's July 2005 opinion and because the ALJ's finding that her onset date of disability was "during that same time period," the ALJ's decision was supported by substantial evidence in the record. (Def.'s Mem. 7.)

In support of its position, the Commissioner also relies on the fact that the severity of Meneire's disease is difficult to diagnose. "As acknowledged by [Crenshaw] in her brief, the regulations note that with Meneire's disease, 'remissions are unpredictable and irregular . . . hence, the severity of impairment is best determined after prolonged observation and serial reexaminations.'" (Def.'s Mem. 6.)  In addition, the Commissioner argues that Crenshaw's assertion that her disability began in

13

October 2000 is not sufficiently supported by the record because at that time, although she was laid off from her job as a mortgage banker, it was "not for medical reasons." (Def.'s Mem. 5.)

In reply, Crenshaw points out that nowhere in Dr. Klug's July 2005 Medical Opinion Form does Dr. Klug refer to any May 2004 dates, and that, as such, Dr. Klug's form "is not evidence that May 23, 2004, was the date [Crenshaw's] disability began." (Pl.'s Resp. 2.) As a result, Crenshaw argues that Dr. Klug's July 2005 opinion does not substantially support an onset date of 14 months prior. (Pl.'s Resp. 2.)

The critical date for the onset date is not the date of a diagnosis, but rather is the onset date of the disability. *See Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 304 (6th Cir. 1988) (citing *Swanson v. Sec'y of Health & Human Servs.*, 763 F.2d 1061, 1065 (9th Cir. 1985)). The law is clear in the Sixth Circuit that the onset date of a disability can be established prior to the date of the definitive diagnosis. *See id.* (stating that disability can be established prior to date of diagnosis); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989) (affirming that in the case of slowly progressive impairments, it is not necessary for an impairment to have reached Listing severity before onset can be established). Thus, if medical evidence supports a finding of disability, then the Commissioner is not "substantially justified in relying on the date of diagnosis as the date of disability." *Willbanks*, 847 F.2d at 304 (quoting *Swanson*, 763 F.2d at 1066 n.2)).

14

Upon review of the entire record, this court finds that the ALJ's determination that Crenshaw did not become disabled until May 23, 2004, is not supported by substantial evidence. The ALJ's finding appears to hinge solely on an erroneous finding of when Crenshaw was diagnosed with Meniere's disease. It appears from both the entire record and the ALJ's decision that the crux of the ALJ's holding was that Crenshaw was diagnosed on May 23, 2004, with Meniere's disease. In his decision, the ALJ stated that "May 23, 2004, [was] the month she was definitively diagnosed with Meniere's Disease." (R. at 18.) As pointed out above by both the Commissioner and Crenshaw, Crenshaw was not diagnosed with Meniere's disease on May 23, 2004. Indeed, there is not any evidence supporting the finding of that date as the onset date, as May 23, 2004 was not even a date of any physician visits or medical records. Rather, May 25, 2004 was the date that Crenshaw revisited Dr. Klug regarding her vertigo-related symptoms and the date she was referred to Dr. Shea for further testing, but even then she did not receive a diagnosis.

The ALJ's determination of the onset date does not have substantial evidentiary support nor was there an adequate explanation of how he determined May 24, 2004, to be the onset date. *See Lopez v. Barnhart*, 336 F.3d 535 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). Accordingly, this court recommends therefore that the case be remanded for further consideration of the onset date of Crenshaw's disability.

    2.   *Whether the opinion of a medical expert was necessary in determining the onset date.*

15

Crenshaw contends that under Social Security Ruling 83-20, the ALJ should have obtained the opinion of a medical advisor in choosing Crenshaw's disability onset date rather than choosing an arbitrary date in the course of Crenshaw's long medical history as the onset date. (Pl.'s Resp. 4—5.) Crenshaw contends that her medical records show complaints and treatment for her vertigo-related symptoms as far back as April 1999. (Pl.'s Resp. 5.) Therefore, Crenshaw argues that the ALJ's finding was improper because the ALJ, "when looking at [Crenshaw's] long history of treatment for vestibular dysfunction . . . chose an arbitrary date in the course of that history without the advice of a medical expert." (Pl.'s Resp. 5.)

In response, the Commissioner argues that the ALJ did not need a medical expert to infer an onset date because the ALJ's finding that Crenshaw's condition was not disabling until May 2004 was based on substantial evidence provided by Crenshaw's extensive medical records. (Def.'s Mem. 7–8.) The Commissioner contends that under *McClanahan v. Commissioner of Social Security*, 474 F.3d 840 (6th Cir. 2006), the ALJ "does not need to ask a medical expert to infer an onset date, when there are contemporaneous medical records upon which he can rely." (Def.'s Mem. 7–8.)

Social Security Ruling 83-20 provides three factors to be considered in determining the onset date for medical conditions of non-traumatic origin: "(1) the 'starting point' is the claimant's alleged onset date, which should be used if consistent with available evidence; (2) consideration of work history, noting the

16

date the claimant was no longer able to work is frequently of great significance in selecting the correct onset date; and (3) consideration of medical evidence, which serves as the primary element in determining onset." S.S.R. No. 83-20.

According to Social Security Ruling 83-20, an earlier onset date may be inferred from medical evidence:

> Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e. be decided on medical grounds alone) before onset can be established . . . In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset date of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination . . . How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred.

S.S.R. 83-20 at 2.

Crenshaw relies on *Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir. 1989), where the court stated:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. . . . Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached Listing severity (i.e. be decided on medical grounds alone) before onset can be established.

*Blankenship*, 874 F.2d at 1122.

In *McClanahan*, a case involving a disability claim for degenerative disc disease, the court found that the ALJ was not required to consult a medical expert to infer on onset date because

17

the medical record was well developed and carefully reviewed by the ALJ. *McClanahan*, 474 F.3d at 830, 837. The court also noted that *McClanahan* was "easily distinguishable" from *Blakenship* because in *Blankenship*, the plaintiff was diagnosed with multiple psychiatric disorders far in advance of his disability determination for schizophrneiform disorder and the court found that the accompanying medical record "contained a plethora of evidence supporting an earlier onset date of disability." *Id.* at 840 (citing *Blankenship*, 874 F.2d at 1121). The court noted that such was not the case in *McClanahan*, "where the bulk of the medical evidence in the record [did] not support an earlier onset date." *Id.*

This court has already found that the ALJ's finding of a May 23, 2004 disability onset date lacks evidentiary support and that the ALJ failed to provide an adequate discussion of the basis for his finding that Crenshaw's impairment did not meet a Listing. Although Crenshaw's medical record is extensive, it is conceivable that an earlier onset of disability could be found consistent with the rulings of both *McClanahan* and *Blankenship*. As a result, it is recommended that this issue be remanded to the Commissioner for further determination and that the services of a medical expert be obtained to determine the proper disability onset date.

C.   Impairment Under Listing § 2.07

Crenshaw also argues that the ALJ erred when he found that Crenshaw's impairment did not meet or equal any of the listed impairments because her impairment met the requirements of Listing

18

§ 2.07[6] as early as August of 2001 and she produced medical reports documenting that the specific criteria for this Listing was met. (Pl.'s Mem. 6–8; Pl.'s Resp. 3.)  Crenshaw asserts that she has a lengthy, well-documented history of debilitating vertigo-related symptoms that meet the listed criteria.  In August 2001, Dr. Klug reported that audiometry, ENG and ECOG testing was positive for Meneire's disease and diagnosed her with Meniere's disease.  (R. at 361.)  Crenshaw further insists that her positive ENG test for vestibular dysfunction met the requirements of section A of Listing § 2.07 and that caloric testing is not required.  (Pl.'s Resp. 3.) Dr. Fetterman diagnosed Crenshaw with benign paroxysmal positional vertigo (BPPV) and vestibular dysfunction in June 2002.  (R. at 157.)  In August 2004, Dr. Shea determined from audiometry testing that Crenshaw suffered mild hearing loss and diagnosed her as having "some type of vestibulopathy."  (Pl.'s Mem. 7.)

---

[6]     The Listings include one for disturbance of labrynthine-vestibular function, including Meniere's disease.  It provides:

    Disturbance of labrynthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
    A.    Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
    B.    Hearing loss established by audiometry.

20 C.F.R. pt. 404, subpt. P, app. 1 § 2.07.  "Vestibular function is assessed by positional or caloric testing preferably by electronystagmography."  20 C.F.R. pt. 404, subpt. P, app. 1 § 2.00(B)(2).

19

In support of the ALJ's finding, the Commissioner argues that there is substantial evidence that Crenshaw's impairments did not meet or equal the requirements of any listed impairment because Crenshaw failed to meet her burden of proof in showing that her impairment matched a listing. (Def.'s Mem. 8—10.) Specifically, the Commissioner charges that Dr. Klug's 2001 diagnosis indicating Meneire's disease was insufficient because it lacked the required, objective medical reports documenting that the required criteria of Listing § 2.07 was met. (Def.'s Mem. 9.) The Commissioner further argues that Crenshaw could not satisfy Listing § 2.07 criteria because the required caloric testing was not completed due to Crenshaw's hypersensitivity. (Def.'s Mem. 10.)

In order to meet a Listing, a claimant must (1) have a diagnosed condition that is included in the Listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable Listing and the duration requirement. 20 C.F.R. § 404.1525(c)(d). If an individual meets the requirements of a listed impairment, then he or she is found automatically disabled, without regard to age, education, or work experience. 20 C.F.R. § 404.1520(d). If the ALJ determines that the impairments do not meet the listings, he or she must explain in detail why a claimant does not meet a particular Listing. *See Miller v. Comm'r of Soc. Sec.*, 181 F. Supp. 2d 816, 819—20 (S.D. Ohio 2001).

At step three of the five-step disability analysis, the ALJ found that, "Crenshaw did not have an impairment that meets or

equals the listed criteria of any listed impairment." (R. at 17.)
The ALJ failed to engage in any analysis under this step, and
therefore the court is unable to conduct a meaningful review of the
ALJ's decision on step three because it is not known which criteria
the ALJ found Crenshaw failed to meet and which evidence the ALJ
relied on for his determination.   Regardless of the Commissioner's
argument that there is substantial evidence to support the ALJ's
finding, because the ALJ failed to provide the basis for his finding
that the impairments failed to meet the listed criteria for any
listed impairment, this court recommends that the case be remanded
on this issue as well.

CONCLUSION

For the foregoing reasons, it is recommended that the case be
remanded.

RESPECTFULLY SUBMITTED this 20th day of August, 2007.

s/ Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE